THE WITNESS:

A: It was not established at that time in August that it was a seniority list.

(LeClaire Dep. at 57–59.)

**M.C. JEFFERS, Al Porter, Evangeline Brown, Clyde Collins, Earl Foster, The Rev. Ellihue Gaylord, Shirley M. Harvell, Linda Shelby, J.C. Jeffries, Joseph Perry, Clinton Richardson, T.E. Patterson, Earnest Simpson, Brian Smith, and Charlie Statewright, on Behalf of Themselves and all Others Similarly Situated, Plaintiffs,**

v.

**Jim Guy TUCKER, in his Official Capacity as Governor of Arkansas and Chairman of the Arkansas Board of Apportionment; W.J. McCuen, in his Official Capacity as Secretary of State of Arkansas and Member of the Arkansas Board of Apportionment; and Winston Bryant, in his Official Capacity as Attorney General of Arkansas and Member of the Arkansas Board of Apportionment, Defendants.**

No. H–C–89–004.

United States District Court,
E.D. Arkansas, E.D.

Sept. 2, 1993.

Dissenting Opinion of Senior District Judge Eisele Nov. 15, 1993.

Don E. Glover, Dermott, AR, Perlesta A. Hollingsworth, Hollingsworth Law Firm, P.A., Little Rock, AR, Olly Neal, Jr., Marianna, AR, L.T. Simes, II, Simes & Simes, West Helena, AR, Perda D. Hair, Washington, DC, Julius L. Chambers, Sherrilyn Ifill, Dayna L. Cunningham, NAACP Legal Defense Fund, Inc., New York City, Sheila Y. Thomas, NAACP Legal Defense Inc., Washington, DC, Donna L. Dennis, Debevoise & Plimpton, New York City, Kathleen Bell, Chanc/Probate Judge, First Judicial Dist. of Ark., West Helena, AR, for plaintiffs.

Phil W. Campbell, Paula Jamell Storeygard, Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, AR, for Robert Nelson, James Wilburn, Christine Brownlee, James Walter Adams and Louise Evans.

Tim C. Humphries, Atty. General's Office, Frank J. Wills, III, B. Frank Mackey, Jr., P.A., Little Rock, AR, for W.J. McCuen, Arkansas Bd. of Appointment and Winston Bryant.

Field Kindley Wasson, Jr., Chief Legal Counsel, Office of the Governor, Frank J. Wills, III, Little Rock, AR, for Bill Clinton and Jim Guy Tucker.

Frank J. Wills, III, Little Rock, AR, for Steve Clark.

Before RICHARD S. ARNOLD, Chief Circuit Judge, EISELE, Senior District Judge, and HOWARD, District Judge.

RICHARD S. ARNOLD, Chief Circuit Judge.

The defendants in this voting-rights case have moved for summary judgment, arguing that plaintiffs have not met an essential element of their case. They also argue that the plaintiffs previously settled the case with them and that this bars the plaintiffs' chal-

lenge to the redistricting plan. We reject both arguments.

## I.

In a previous opinion addressing the 1981 Arkansas Apportionment Plan, we held that the then-impending 1991 Arkansas Apportionment Plan would not go into effect until 60 days after the Apportionment Board had adopted it, so that the Court could entertain "any challenge by the plaintiffs in this case to such plan." *Jeffers v. Clinton,* 740 F.Supp. 585, 602 (E.D.Ark.1990), *appeal dismissed,* 498 U.S. 1129, 111 S.Ct. 1096, 112 L.Ed.2d 1200 (1991). Plaintiffs took advantage of this ruling to challenge the 1991 Plan, arguing that it violated Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. See *Jeffers v. Clinton,* 812 F.Supp. 907 (E.D.Ark.1993). The defendants now have moved for summary judgment against the challenge, brought by one group of plaintiffs, to the 1991 Plan for Eastern Arkansas. They argue that the plaintiffs have not met one of the preconditions for showing that the 1991 Plan violates the Voting Rights Act in Eastern Arkansas, an area known as the Delta.

The 1991 Plan for the Delta establishes four House districts and one Senate district with black-majority voting age populations ("VAP"). These regions have a black VAP of at least 60%, so that African–Americans will constitute a "super-majority" in those districts. Plaintiffs claim that this dilutes their voting strength. Specifically, it concentrates or "packs" African–Americans into too few districts, thus "minimiz[ing] the total number of districts in which black voters can select their candidate of choice." *Voinovich v. Quilter,* 507 U.S. ——, ——, 113 S.Ct. 1149, 1153, 122 L.Ed.2d 500 (1993). The Supreme Court has recognized that " '[d]ilution of racial minority group voting strength may be caused ... [by] the concentration of blacks into districts where they constitute an excessive majority.' " *Id.* at ——, 113 S.Ct. at 1155 (quoting *Thornburg v. Gingles,* 478 U.S.

30, 46 n. 11, 106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25 (1986)). The plaintiffs ask us to remedy this by ordering the establishment of one more House district and one more Senate district in the Delta. Although this would give African–Americans in most of the black-majority districts in the Delta a bare majority rather than a super-majority, it would increase the number of those districts and, possibly, the number of minority-preferred candidates elected.

■ Section 2 of the Voting Rights Act prohibits legislation that dilutes the voting strength of the minority group. To find a violation of this provision, we must first find that the plaintiffs have met the three "necessary preconditions" set forth in *Thornburg v. Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766. The minority group must show that it is large enough and compact enough to constitute a majority in a single-member district, that it is a politically cohesive group, and that the white majority votes as a bloc so that it usually defeats the minority's preferred candidate.[1] The defendants argue that the plaintiffs have not met the first of these factors. They say that the African–American population is not compact, and therefore the additional black-majority, single-member districts the plaintiffs seek cannot be reasonably compact and contiguous.

To show this, the defendants submitted an affidavit of John K. Wildgen, Ph.D. He used the figures from the plaintiffs' plan, setting the lines of the various voting districts and the percentage of African–Americans in them, to draw maps of their proposed districts.[2] Interpreting his maps, he declares that he "cannot verify" the contiguity and integrity of the plaintiffs' proposed additional districts. Affidavit of John K. Wildgen, Ph. D., at 2. It is true that some of the proposed districts shown in Dr. Wildgen's maps look noncontiguous. This proves, the defendants argue, that the black population in the area is not sufficiently compact and contiguous to

---

1. Although *Gingles* involved multimember districts, the Supreme Court has held that its preconditions apply also to single-member districts such as those at issue here. *Growe v. Emison,* —— U.S. ——, ——, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993).

2. The plaintiffs did not submit maps with their figures. The absence of such maps makes evaluation of the claim that they meet the first of the *Gingles* factors more difficult than it needs to be. We expect the plaintiffs to present their plan in map form at trial.

meet the first precondition for showing a Voting Rights Act violation.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Parties opposing the grant of summary judgment must produce evidence tending to establish the essential elements of their case, *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), and cannot rely only upon general assertions that genuine issues of fact remain. Fed.R.Civ.P. 56(e); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990). However, the facts, and inferences drawn from them, "must be viewed in the light most favorable to the party opposing" the summary-judgment motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam).

Even though some of the districts drawn by Dr. Wildgen appear not to be compact or contiguous, we cannot grant summary judgment to the defendants on the basis of Dr. Wildgen's work, because we must construe the facts in favor of the non-movants, the plaintiffs. The plaintiffs contest Dr. Wildgen's maps, saying that they do not accurately reflect the plaintiffs' plan, because some of the non-contiguities Dr. Wildgen found are not really there. Affidavit of Vickie Robertson 1–2. We agree with the plaintiffs that material questions remain about whether Dr. Wildgen's interpretation of the proposed districts accurately reflects the plaintiffs' proposal. The flaws he indicates include gaps between areas that are part of one district, "colonies" that are entirely separated from the district of which they are a part, and enclaves within one district that are part of another district. All of these, if true, would indicate noncontiguous or noncompact areas.

Specifically, Dr. Wildgen points to, and the plaintiffs' expert, Vickie Robertson, disputes, that the plaintiffs' plan has these problems: in House District 72, a gap in the Monroe County district; in House District 74, an "isolated colony" not adequately connected to the rest of the Crittenden County district, and enclaves within enclaves in Forrest City (St. Francis County); in House District 75, enclaves in both Phillips and Lee Counties; and in Senate District 7, "isolated blocks" in Chicot County and West Helena, and enclaves in Phillips County. Wildgen Affidavit 3–5; Robertson Affidavit 1–2. In addition, Dr. Wildgen points to enclaves in Phillips County in District 72, and Ms. Robertson avers that these were intentionally included in her plan. Dr. Wildgen also finds in Senate District 22 a "virtual enclave" in Crittenden County, which seems to be a one-block corridor connecting parts of the district. Ms. Robertson states that a corridor cannot be considered an enclave, and that this corridor is similar to some of those in the defendants' own plan. Finally, Ms. Robertson has not replied to Dr. Wildgen's finding of "suspicious looking links in Mississippi County, and scattered holes in Lee and St. Francis Counties" in Senate District 22. Although the plaintiffs have not yet shown that these problems do not exist, they dispute the accuracy of Dr. Wildgen's claims.

In his second affidavit, dated June 30, 1993, Dr. Wildgen declares that the plaintiffs' expert, Ms. Robertson, agreed at a June 28, 1993, meeting that there were people who were double-counted in the population estimates in plaintiffs' proposed Senate District 7. Dr. Wildgen also declares that Ms. Robertson had reconsidered her declaration in her affidavit with respect to possible enclaves in Senate District 7, and that she said she had revised the plaintiffs' plan to remedy this. He also avers that the plaintiffs claimed to have revised their plan, correcting the gap he had found in Monroe County in House District 72 by adding a corridor, correcting the enclave within the enclave in House District 74 (Forrest City), and correcting other enclaves in House Districts 72, 74, and 75. Affidavit of John K. Wildgen (June 30, 1993), at 2–3. That plaintiffs have made these corrections to their plan means, the defendants say, that the plaintiffs have admitted that Dr. Wildgen's first affidavit, finding non-contiguities in many of the districts, was substantially true. It is now undisputed, the defendants argue, that the non-contiguities claimed by Dr. Wildgen actually

existed in plaintiffs' original plan for House Districts 72, 74, 75, and Senate District 7.

We thus have before us a series of highly specific factual disputes. Defendants are right in pointing out that plaintiffs have not, by affidavits, cleared up all of the objections to their proposed districts. We certainly cannot say, however, as a matter of law, that none of the districts now tentatively proposed by plaintiffs would be sufficiently compact and contiguous. Moreover, the plaintiffs may be able, at trial, to correct at least some of the problems remaining with their proposal. In *Jeffers v. Clinton*, 730 F.Supp. 196, 208 (E.D.Ark.1989), *aff'd mem.*, 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), we allowed the plaintiffs, even after trial, to correct their proposed plan by eliminating an "island" within one district.

For the reasons given above—and particularly because of the fact-intensive and specific nature of the information needed to determine district lines and population percentages—we believe that material issues of fact remain to be resolved.

## II.

The defendants also ask us, in effect, to reconsider our recent holding, in *Jeffers v. Clinton*, 812 F.Supp. 907 (E.D.Ark.1993), that no settlement agreement precluded the plaintiffs' challenges to the 1991 Arkansas Apportionment Plan. We are still convinced that, as a matter of law, there was no settlement agreement.

## A.

In response to plaintiffs' challenge to the Delta portion of the Plan, the defendants moved for summary judgment in February 1992. They argued that plaintiffs were estopped to challenge the 1991 Plan because the plaintiffs' attorney, P.A. Hollingsworth, had settled the case by agreeing with the Plan for the Delta. We denied summary judgment. We said that material questions of fact existed whether Mr. Hollingsworth had settlement authority, and we held that there was no settlement agreement as a matter of law. *Jeffers v. Clinton*, 812 F.Supp. at 909–10.

The parties later submitted pre-trial memoranda stating the issues remaining to be tried. Despite the Court's ruling, the defendants, in their pre-trial submissions, renewed their argument that the plaintiffs had settled their case with the Board as to the 1991 Plan for the Delta. At the pre-trial conference on June 23, 1993, the Court questioned the defendants' attorney, Tim Humphries, about this. Mr. Humphries's response amounted to a request for reconsideration, and we agreed that we would issue this clarifying order.

■ Before turning to the defendants' arguments, we observe that this Court has the authority to grant summary judgment against the movant even when the non-movant has not made a cross-motion for summary judgment. *Johnson v. Bismarck Public School Dist.*, 949 F.2d 1000, 1004–05 (8th Cir.1991); *Burlington Northern v. Omaha Public Power Dist.*, 888 F.2d 1228, 1231 n. 3 (8th Cir.1989). This is because "[w]hen there has been a motion but no cross-motion, the judge already is engaged in determining whether a genuine issue of material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of summary judgment." 10A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2720, at 29 (2d ed. 1983). In this case, we are satisfied that the defendants had adequate opportunity to try to show that the plaintiffs were not entitled to summary judgment as a matter of law and that there was a genuine issue of fact left in the case. See *id.* at 34; *Burlington Northern, supra.*

The defendants first argue that this case resembles *Moore v. Beaufort Co., North Carolina*, 936 F.2d 159, 160 (4th Cir.1991). In *Moore*, the plaintiffs had claimed that the Board of County Commissioners violated § 2. The parties entered into settlement negotiations, and the defendants then refused to carry out the agreed-upon terms. *Id.* at 160–61. The plaintiffs sued to enforce the settlement. The defendants argued that there was no settlement, but the court disagreed. *Id.* at 162–63. The court also held that the defendants' attorney had actual and apparent authority to settle the case. *Id.* at

163–64. In reaching this conclusion, the court said that the "general rule is that counsel of record have the authority to settle litigation on behalf of their client." *Id.* at 163 (citation omitted). But, as we stated in our earlier opinion, "Arkansas law requires attorneys to obtain specific authority before entering into settlement agreements on behalf of their clients." *Jeffers v. Clinton,* 812 F.Supp. at 909 (citing *McKenzie v. Boorhem,* 117 F.Supp. 433, 435 (W.D.Ark.1954)).

Moreover, our holding in the *Jeffers* case does not put us at odds with the Fourth Circuit; the two cases are easily distinguished. First of all, here, but not in *Moore,* the defendants recognized and reiterated the plaintiffs' right to challenge the 1991 Plan. *Jeffers v. Clinton,* 812 F.Supp. at 909. Moreover, the agreement upheld in *Moore* was made in the context of settlement negotiations, in which the new plan was developed solely to resolve the litigation. *Id.* at 160–61. This was not the case here, where the 1991 Plan was developed not as a settlement to the *Jeffers* litigation, but because redistricting is done in Arkansas after each census, whether or not there is litigation. Furthermore, in *Moore,* the settlement terms were written, first in a letter and second in a draft consent judgment. *Id.* at 161. This was not the case in *Jeffers.* Thus, the Fourth Circuit's holding that there was apparent and actual authority to settle the case in *Moore* was reached in a very different situation. For this reason, that ruling does not affect our holding that material facts remained unresolved whether Mr. Hollingsworth was authorized to settle *Jeffers.*

In any case, whether Mr. Hollingsworth had authority to settle on behalf of the plaintiffs is not the main point here. Whether or not he had such authority, he did not settle this case. We kept open the period to challenge the 1991 plan so that we could hear "any challenge" the plaintiffs wished to bring. *Jeffers v. Clinton,* 740 F.Supp. at 602. And, as we have said, both sides referred to this several times during the October 1991 hearings. *Jeffers v. Clinton,* 812 F.Supp. at 909. This is the primary reason for our holding, as a matter of law, that there was no settlement agreement. *Id.* at 910. In addi-

tion, the defendants stipulated with the plaintiffs that "[t]he parties agree the 60 days in which plaintiffs have to challenge the Board's plan begins as of October 29, 1991." Stipulation (Oct. 30, 1991), at 2. In our view, if any agreement was reached, it was an agreement that the plaintiffs retained their right to challenge the 1991 Plan.

■ The defendants argue, however, that although Mr. Hollingsworth objected to district lines or population percentages, he never contested what the plaintiffs now challenge, the number of Senate or House black-majority districts to be created in the Delta. Therefore, they argue, there was an agreement on the number of districts. We disagree. The second proposition does not flow from the first. Mr. Hollingsworth need not have presented to the Board of Apportionment every potential objection later to be raised in court. His not having done so does not prove that a settlement agreement was reached, particularly when the defendants agreed on the record that voting on the plan would not prejudice "any rights of appeal that you [plaintiffs] might have on any issue." *Jeffers v. Clinton,* 812 F.Supp. at 909 (quoting State of Arkansas Board of Apportionment Hearing, October 11, 1991, at 36). Likewise, the defendants' having sat "side by side" with plaintiffs when drafting portions of the 1991 Plan, and their working out some differences of opinion on the Delta part of the plan "in a mutually agreeable manner," Defendants' Pre–Trial Memorandum (June 7, 1993), at 2, 11, is simply not evidence of a settlement on this issue.

### B.

■ Both our prior opinion on the settlement-agreement question, and, so far, this opinion, are premised on defendants' arguments that "[o]n-the-record statements and testimony of Mr. Hollingsworth ... demonstrate that the ... plan represents a compromise agreement...." Defendants' Brief in Support of Motion for Summary Judgment (Feb. 13, 1992), at 17; see also *id.* at 20. That is, until now, the defendants argued that the alleged settlement was reached during the Board of Apportionment's hearings on October 4 and 11, 1991, before its adop-

tion of the 1991 Plan. At the June 23 pre-trial conference, however, the defendants changed their argument. They said that they had settled the case with Mr. Hollingsworth at some time other than during the hearings. Nevertheless, the defendants have not moved for summary judgment on this question; they have submitted no affidavits or other documents tending to show that there was an off-the-record settlement of this case. Instead, the defendants' position appears to be, simply, that material facts about the claimed settlement agreement remain to be tried.[3]

We do not agree. We have ruled, and now reaffirm, that "as a matter of law ... there was no settlement agreement" between the parties in this case. *Jeffers v. Clinton*, 812 F.Supp. at 910. No affidavit attesting to a handshake agreement between Mr. Hollingsworth and the defendants or their attorney could alter our ruling that there was not a settlement agreement, when both parties so clearly stated on the record that the plaintiffs retained the right to challenge, in accordance with our prior opinion, *Jeffers v. Clinton*, 740 F.Supp. at 602, the 1991 Plan after its adoption. As we said before, "[i]t seems to us inconceivable that a matter of this magnitude would be settled without a formal writing embodying the terms of a settlement." *Jeffers v. Clinton*, 812 F.Supp. at 909. Moreover, if defendants could have produced such an affidavit, they should have done so at the time of their first motion for summary judgment.

### III.

For these reasons, we confirm our previous ruling that there was no settlement agreement as a matter of law. We also deny the defendants' summary-judgment motion on the non-contiguity of the Delta districts plaintiffs have proposed. We express no opinion on whether the plaintiffs will show that the 1991 Plan violates the Voting Rights

Act or whether they are entitled to the remedy sought. We hold only that the case should be tried.

It is so ordered.

EISELE, Senior District Judge, dissents, and will file an opinion stating his views in due course.

EISELE, Senior District Judge, dissenting.

[Filed November 15, 1993]

The majority opinion, filed September 2, 1993, deals with two summary judgment issues: (1) whether material issues of fact remain to be tried with respect to the defendant's contention that plaintiffs' are estopped to challenge the Delta area part of the 1991 Plan because they agreed thereto; and (2) whether the conceded facts show that plaintiffs cannot establish a violation of the Voting Rights Act because their own proposed Plan does not meet the necessary preconditions of "compactness" and "contiguity" as required by the Supreme Court in *Thornburg v. Gingles* 478 U.S. at 50–51, 106 S.Ct. at 2766.

I will shortly state my views on these two issues, but I write today primarily to discuss other issues and principles of law which convince me that this case should be dismissed. I will first restate my position that this particular three judge District Court does not have jurisdiction of the subject matter of this litigation. But I also raise, *sua sponte*, other principles of law which in my opinion bar this attack by the named plaintiffs on the 1991 Plan.

### CONTEXT AND BACKGROUND

This is public interest litigation the outcome of which can affect the basic political rights of many thousands of Arkansas citizens. Those citizens are not parties to this lawsuit and it is doubtful that many are even aware of the case or of its possible consequences. Furthermore, the dynamics of this

---

**3.** The subgroup of plaintiffs that Mr. Hollingsworth continues to represent have not challenged the 1991 Plan for the Delta (but they do challenge the Plan for Pulaski County). He did not express an opinion on the merits of this issue at the pre-trial conference, but he did observe that if the defendants pressed this issue further, both

he and Mr. Humphries would have to appear as witnesses at trial to the alleged existence and terms of the settlement agreement. This, Mr. Hollingsworth observed, was likely to result in the disqualification of both attorneys, who should not act as witnesses to a material fact and advocates in the same proceeding.

type of litigation are such that the traditional safeguards of our adversary trial system cannot be relied upon to raise and argue all of the important issues. As I stated in *Turner v. State of Arkansas,* 784 F.Supp. 553, at 563 (E.D.Ark.1991):

> The adversarial system does not work too well in this type of litigation because of the absence of adequate notice to affected parties and also because of the mixed motives and interests of the actual parties and the sponsors of such litigation.

An example of this dynamic was cited in a footnote to that observation as follows:

> Another illustration of this non-partisan political phenomenon may possibly be found in the decision of the defendant Democratic office holders (constituting the State Board of Apportionment) to abandon in favor of the successful black plaintiffs the "preclearance" issues on appeal to the U.S. Supreme Court in the *Jeffers* case thereby depriving the people of Arkansas and the Arkansas General Assembly of the opportunity for a definitive ruling on the legality and constitutionality of the Court's chilling holding "that any further statutes, ordinances, regulations, practices or standards imposing or related to a majority-vote requirement in general elections in this State must be subjected to the preclearance process." *Jeffers,* 740 F.Supp. at 601. The defendants' concession might well make sense to a sensitive, concerned and accountable politician. But who is there to stand for the vindication of the right of people of Arkansas to decide when and if to impose a majority-vote requirement in its general elections without having to seek the permission of a federal court? The failure of the defendants to pursue the appeal has left a permanent cloud over the state's right to extend the principle of majority rule.

So it is incumbent upon the Court to examine such voting rights litigation independently, recognizing that we are not dealing with the typical civil case between private parties seeking vindication of only private interests.

The majority opinion aptly states the basis for plaintiffs' present challenges to the 1991 Arkansas Apportionment Plan:

The 1991 Plan for the Delta establishes four House districts and one Senate district with black-majority voting age populations ("VAP"). These regions have a black VAP of at least 60%, so that African-Americans will constitute a "super-majority" in those districts. Plaintiffs claim that this dilutes their voting strength. Specifically, it concentrates or "packs" African-Americans into too few districts, thus "minimiz[ing] the total number of districts in which black voters can select their candidate of choice." *Voinovich v. Quilter,* [507 U.S. ——, ——] 113 S.Ct. 1149, 1153 [122 L.Ed.2d 500] (1993). The Supreme Court has recognized that "'[d]ilution of racial minority group voting strength may be caused ... [by] the concentration of blacks into districts where they constitute an excessive majority.'" *Id.* [at ——] at 1155 (quoting *Thornburg v. Gingles,* 478 U.S. 30, 46 n. 11 [106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25] (1986)). The plaintiffs ask us to remedy this by ordering the establishment of one more House district and one more Senate district in the Delta. Although this would give African-Americans in most of the black-majority districts in the Delta a bare majority rather than a super-majority, it would increase the number of those districts and, possibly, the number of minority-preferred candidates elected.

The problem is that the super-majority districts that these plaintiffs now attack are not materially different from the districts created by order of this Court *in response to the demands of those same plaintiffs* when they were attacking the 1981 Plan. In fact it appears that the defendants' approach to redistricting in 1991 was to follow the Plan approved by this Court in 1990 as closely as possible, making only those changes required by the population changes that occurred between 1980 and 1990 in order to meet the "one-person one-vote" objective.

So irony of ironies: These plaintiffs who prevailed upon the majority of this Court, over a strong dissent, to create "super-majority" districts in 1990 in East Arkansas now contend that in 1991 the defendant members of the State Board of Apportion-

ment violated Section 2 of the Voting Rights Act by doing that very same thing.

Yes, by "packing" black citizens into such super-majority districts, the total number of districts in which black voters, assuming block voting by race, can elect candidates of their choice is reduced.[1] *Voinovick v. Quilter*, 507 U.S. ——, ——, 113 S.Ct. 1149, 1153, 122 L.Ed.2d 500 (1993). And, yes, the United States Supreme Court has recognized that "'dilution of racial minority group voting strength may be caused ... [by] the concentration of blacks into districts where they constitute an excessive majority'" *Id.* at ——, 113 S.Ct. at 1155.[2] Indeed, "packing" has been a traditional gerrymandering device, surfacing most frequently in districting fights between Republicans and Democrats. The *dissent* in this case, dealing with the attack on the 1981 Plan, made that very point: The majority, by mandating super-majority black districts, thereby ordered into effect a plan which, if decreed by the Board of Apportionment, would clearly violate the Voting Rights Act. It was the minority's view that, even if the Voting Rights Act was violated in the 1981 Plan, "relief" in the form of super-majority black districts would not be permitted. So why do I now have a problem with these plaintiffs attempting to correct the error they made in 1990? I will answer that question shortly, but first things first. And always first is jurisdiction.

## LACK OF SUBJECT MATTER JURISDICTION

It is my opinion that this three judge court, constituted to deal with the challenges to the 1981 Plan (based on the 1980 Census), does not have jurisdiction to hear this challenge, filed in the same suit, to the Plan approved by the Board of Apportionment in 1991 (reflecting changes required by the 1990 census). The only possible predicate for attacking the 1991 Plan *in this suit* is the following language contained in the majority opinion dealing with the challenge to the 1981 Plan, to-wit:

We further direct that the Plan of apportionment for the State Legislature to be adopted by the Board of Apportionment after the 1990 census not take effect until the plaintiffs have had a chance to inspect it and to challenge it in this Court.

\* \* \* \* \* \*

We deem it appropriate to impose one further item of relief in the nature of pre-clearance, not as a matter of statute, but as a matter of inherent equitable power. After the 1990 Census, the Board of Apportionment will face once again the task of drawing district lines for the House and Senate. We direct that no Plan of apportionment so adopted may go into effect until 60 days have elapsed from the date of its final adoption by the Board. This Court will retain jurisdiction, within that time period, for the purpose of entertaining any challenge by the plaintiffs in this case to such Plan. If no such challenge is forthcoming, the Plan may go into effect, subject, however, to the right of any aggrieved citizen to challenge it in an appropriate action at a later time. This retention of jurisdiction is not required by Section 3(c) of the Act, but plaintiffs have requested it, in the alternative, and we believe it is appropriate under the facts of this case. In fact, such a period of vulnerability, so to speak, should work to the advantage of the State, because if the Plan adopted in 1991 survives this hurdle the chances of its being allowed to govern undisturbed until the Census of 2000, will be, as a practical matter, greatly enhanced.

*Jeffers v. Clinton,* 740 F.Supp. 585, 587, 602 (E.D.Ark.1990). And we find similar language in the judgment entered, to-wit:

No Plan of apportionment adopted by the defendant Board of Apportionment for the Arkansas General Assembly after the 1990 census may go into effect until 60 days have elapsed from the date of its final adoption by the Board. This Court retains jurisdiction, within that time period, for the purpose of entertaining any challenge

---

1. And, as discussed below, the creation of even simple-majority black districts, by "packing," has the same, if less dramatic, effect. That is it reduces over-all black influence.

2. I say this while remaining convinced that a clear majority of the justices on the Supreme Court have yet to put their imprimatur on the concept of "group" voting rights.

by the plaintiffs in this case to such Plan. If no such challenge is forthcoming, the Plan may go into effect, subject, however, to the right of any aggrieved citizen to challenge it in an appropriate action at a later time.

It is my opinion that this three judge court, constituted to hear the challenge to the 1981 Plan, had no power to extend its jurisdiction to determine potential challenges to the 1991 Plan "as a matter of inherent, equitable power."

Reapportionment is required every ten years as a result of changes in population which are revealed in the decennial censuses. Given the ten year hiatus, the membership of the Board of Apportionment would rarely be the same. And that is true here. In 1981 the Board was composed of Governor Frank White, Attorney General Steve Clark and Secretary of State Paul Revere. The Board of Apportionment in 1991 consisted of Governor Clinton, Attorney General Winston Bryant and Secretary of State Bill McCuen.

These reapportionment cases are not like ongoing school desegregation cases or cases challenging the constitutionality of prison conditions. Rather they constitute independent challenges to discreet acts by different parties taken at ten year intervals.

The *Jeffers I* [3] majority made it clear that the only basis for this claimed extension of jurisdiction is the "inherent equitable power" of this Court. The Court acknowledged that such relief was not required by Section 3(c) of the Voting Rights Act. Rather, the relief was granted because "plaintiffs have request-

ed it ... and we believe it was appropriate under the facts of this case."

There is simply no legal basis for this particular three-judge U.S. District Court to establish itself as a permanent overseer of reapportionment Plans. The majority in its 1990 opinion did not go so far as to rule that this court and this case would be the only forum for an attack by anyone upon the 1991 apportionment Plan. Rather, the majority's equitable preclearance relief gave only the named *Jeffers* plaintiffs the right to come back to this Court to challenge the 1991 Plan. So the effect of the majority opinion is to give enhanced status to the plaintiffs who originally challenged the 1981 Plan. In fact, the majority's opinion, fairly read, would *prohibit* any challenge by others for at least the sixty day period specified.[4] It is my opinion that there is no lawful basis or authority for this Court to give preferential standing to the *Jeffers* plaintiffs to challenge the 1991 Plan, nor is there any lawful basis for this Court to control the timing of attacks which others might wish to make on the 1991 Plan.

It could be argued that the majority was simply attempting to provide to the plaintiffs a reasonable and very narrow opportunity to confront any attempt by the 1991 Board of Apportionment to summarily undo the relief previously granted by this Court. Even the plaintiffs in their brief in opposition to the Motion for Summary Judgment state that the Court's retention of jurisdiction "was well within its equitable discretion to insure that the 1991 districting Plan did not reinstate the violations found in the 1981 Plan." If the

**3.** *"Jeffers I"* will be used to refer to all opinions and decisions of this Court dealing with the 1989 attack on the 1981 reapportionment plan. The principal decisions in *Jeffers I* will be found in 730 F.Supp. 196 (E.D.Ark.1989), 740 F.Supp. 585 (E.D.Ark.1990), and 756 F.Supp. 1195 (E.D.Ark.1990). The challenge to the 1991 reapportionment plan filed in this case in December, 1991, and all decisions emanating therefrom will be referred to a *"Jeffers II"*.

**4.** Note the language of the Judgment:

This Court retains jurisdiction, within that time period, for the purpose of entertaining any challenge by the plaintiffs in this case to such Plan. If no such challenge is forthcoming, the Plan may go into effect, subject, however, to

the right of any aggrieved citizen to challenge it in an appropriate action *at a later time.* (Emphasis supplied.)

The language also suggests that if such a challenge is made by the plaintiffs the plan will not go into effect until that challenge has been dealt with by this Court. One wonders: what would happen if some third parties filed a complaint attempting to challenge the 1991 Plan? Would this Court's 1990 order prevent the challenge? If not, would a new three-judge court be constituted to deal with it or would this court, going beyond its retention of jurisdiction order, attempt to take jurisdiction of that case too? If this Court did not stop, or co-opt, that challenge we would have the spectacle of two separate challenges to the 1991 Plan simultaneously pending before two different three-judge district courts.

majority of this Court were inclined to so limit the scope of this retained jurisdiction then, I submit, that the case should still be dismissed because, I gather, no one is contending that the actions of the 1991 Board in any way interfere with or diminish the black voting power which resulted from this Court's earlier Decree or "reinstated the violations found in the 1981 Plan." In any event the point is academic. Since the majority is permitting the *Jeffers* plaintiffs to make this broad attack on the 1991 Plan, it is clear that it does not read the "jurisdictional" language (contained in its 1990 opinion) so narrowly.

So the case should be dismissed because this three-judge court lacks subject matter jurisdiction.

## SUBSEQUENT DECISIONS UNDERCUT OPINION IN JEFFERS I

Next, it is my opinion that the law relied upon by the majority in its 1990 decision (on the 1981 Plan) in holding that there were violations of Section 2 of the Voting Rights Act has been undercut by subsequent cases in the United States Supreme Court and elsewhere.[5] So, in my opinion, if the identical 1990 trial (challenging the 1981 Plan) were held today, the plaintiffs would not, and could not, prevail on their Section 2 claim. And it is apparent that these same *Jeffers* plaintiffs are facing the same problem in their present attack on the 1990 Plan. It will be helpful to spell this out in some detail.

Since the discussion that follows involves the interpretation of Section 2 of the Voters Right Act, I now quote it in full:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

A violation of subsection (a) is established if, based on the totality of the circum-

stances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The majority in the *Jeffers I* case did not believe it was necessary that plaintiffs, (to prove a Section 2 violation) establish that the redistricting plan resulted in plaintiffs having *both* "less opportunity to participate in the political process" *and* "less opportunity to elect representatives of their choice." See language of Section 2. The Court in *Turner v. State of Arkansas,* 784 F.Supp. 553 (E.D.Ark.1991) discussed this *Jeffers I* issue and the change that had occurred in the law as follows:

There is another threshold barrier to plaintiffs' claim here. This can best be identified by reference to a discussion in the *Jeffers* case. It will be recalled that the *Jeffers* Court was not unanimous in answering the following question:

To make out a Section 2 violation, must plaintiffs prove both of the following: that, as a result of the 1981 district lines, blacks (1) have less opportunity to participate in the political processes; and (2) have less opportunity to elect representatives of their choice?

The majority was of the opinion it was not necessary to prove both. That opinion stated:

Even if plaintiffs failed to show less opportunity to participate in the political process, a showing that they have less opportunity to elect candidates of their

---

**5.** The "law of the case" doctrine does not apply. This is clearly a new case to which we must

apply current law.

choice would suffice to establish their claim. The right protected is the aggregate of these opportunities—the right to effective participation in the political system ...

*Jeffers,* 730 F.Supp. at 204. The dissent disagreed. *Id.* at 231.

This argument has now apparently been resolved consistent with the minority's view in *Jeffers.* In *Chisom v. Roemer,* 501 U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the Supreme Court discusses and resolves the issue as follows:

> The LULAC majority assumed § 2 provides two distinct types of protection for minority voters—it protects their opportunity "to participate in the political process" and their opportunity "to elect representatives of their choice."
>
>     \*     \*     \*     \*     \*     \*
>
> Any abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election. As the statute is written, however, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights. Subsection (a) covers every application of a qualification, standard, practice, or procedure that results in a denial or abridgement of "the right" to vote. The singular form is also used in subsection (b) when referring to an injury to members of the protected class who have less "opportunity" than others "to participate in the political process *and* to elect representatives of their choice." 42 U.S.C. § 1973 (emphasis added). It would distort the plain meaning of the sentence to substitute the word "or" for the word "and." Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect.
>
> The statutory language is patterned after the language used by Justice White

in his opinions for the Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). See n. 22, *Supra.* In both opinions, the court identified the opportunity to participate and the opportunity to elect as inextricably linked. In *White v. Regester,* the Court describes the connection as follows: "The plaintiffs' burden is to produce evidence ... that its members had less opportunity than did other ... residents to participate in the political processes *and* to elect legislators of their choice." 403 U.S. at 149, 91 S.Ct. at 1872 (emphasis added).

> The results test mandated by the 1982 amendment is applicable to all claims arising under § 2.

*Chisom* [501 U.S. at ——], 111 S.Ct. at 2364–65.

The point is important to make because the majority in *Jeffers* appears to have conceded that plaintiffs there could not show that the state-legislature redistricting plan at issue resulted in blacks having less opportunity to participate in the political process than others in the electorate. Note the language of the majority's opinion in *Jeffers:*

> ... We further find that voting in the areas of the State in question is markedly polarized by race. Both black and white voters usually prefer candidates of their own race. Black voters are far from powerless. They exercise significant, sometimes decisive influence. But they can elect a candidate of their choice, in a district in which the voting-age population is majority white, only if that candidate is white. For the foreseeable future, the present location of legislative district lines will make it very difficult to elect more than six black legislators, out of a total in both houses of 135 members. And this is so even though black people make up about 16 percent of the total population of the State of Arkansas. In this situation, *black citizens have less opportunity* than other members of the electorate *to elect*

*representative of their choice.* This is a violation of Section 2(b) of the Voting Rights Act, 42 U.S.C. § 1973(b). For reasons we shall explain in this opinion, Plaintiffs have proved a violation of the law in all of the areas of the State called in question by this suit, except for Pulaski County. (Emphasis supplied).

*Turner v. State of Arkansas,* 784 F.Supp. 553, 574–575 (E.D.Ark.1991).

The legal predicate for the majority's finding of a Section 2 violation in *Jeffers I* has, in effect, been reversed by the U.S. Supreme Court in *Chisom.* So even if this Court were to make the same findings as it did in *Jeffers* there would be no basis for holding that the defendants violated Section 2 of the Voters Right Act.

And if it is argued that the majority in *Jeffers I* actually found that the 1981 redistricting plan resulted in blacks having less opportunity to participate in the political process *and* less opportunity to elect representatives of their choice, the basis for such argument (and finding) could only have been one of the "Senate" or "Zimmer" factors.[6] The following discussion in *Turner* makes this clear:

> Even under the majority opinion in *Jeffers,* the only basis for the intervenors to contend that black voters do not have equal opportunity to participate in the political process would be found in one of the Senate factors, i.e., the present effects of past racial discrimination in areas of health, education and employment. · See *Jeffers,* 730 F.Supp. at 204. And the Senate or *Zimmer* [*v. McKeithen,* 485 F.2d 1297] factors cannot suffice for the proof required by Section 2. As stated in the minority-dissenting opinion in *Jeffers:*
>
> > First, Section 2(b) requires a *cause and effect* showing that the *challenged* [standard, practice or procedure (SPP)] is responsible for blacks having "less opportunity than other members of the electorate to participate in the political

process." The finding in *Smith v. Clinton,* 687· F.Supp. 1310 (E.D.Ark.1988) means that neither present legal barriers nor the redistricting plan formulated by the Board of Apportionment in 1981 is responsible for blacks having "less opportunity than other members of the electorate to participate in the political process." Rather, it is the present effects of past discrimination in health, education and employment. Stated otherwise, the opportunity of blacks to participate in the political process would be the same regardless of the manner in which the Board drew the district lines.

\*　　\*　　\*　·　\*　　\*　　\*

The majority would probably reply, as certain other federal courts have, that we must look at the "interaction" of the SPP with impairments blacks suffer as a result of prior discrimination to determine if that SPP results in blacks having less opportunity to participate in the political· process. This is linguistic leg-·erdemain. Clearly it is not the line drawing by the board—the SPP here—which "results" in blacks having less such opportunity; rather, it is the diminished socioeconomic status found to have resulted from prior discrimination.

·And Section 2 does not purport to give remedy solely on the latter basis. At the risk of argumentative overkill, assume the Board had drawn the district lines exactly as plaintiffs now request. Would the opportunity of blacks "to participate" be different? Clearly not. This error in analysis I identify as the source of so much unnecessary intellectual conflict in the "voting rights" cases and as the principal source of the misuse of certain of the *Zimmer* or Senate factors.

Is not all of this obvious? The socioeconomic condition of blacks in any given area—whatever it is—will always be a "given" in any voting rights challenge.

---

6. This view is reinforced by Judge Arnold's finding in *Smith v. Clinton,* 687 F.Supp. 1310 (1988) at 1317:

> We further find that the history of discrimination has adversely affected opportunities for

black citizens in health, education and employment. The hangover from this history necessarily inhibits full participation in the political process.

This language tracts Senate Factor No. 5.

And, unfortunately in this country, from sea to sea, blacks, although making significant progress, still suffer adverse effects in education, the economic arena and health, and, on a statistical basis, are simply not as well off as non-blacks in our society. So, if one accepts that being poor, uneducated, unhealthy, etc., decreases one's "opportunity to participate" in the political process, then there will be no voting SPP which, will be immune from attack. Elections per se could be as readily attacked!

*Jeffers,* 730 F.Supp. at 237–38 (Eisele, C.J., dissenting).

The majority's predicate finding for its holding that the defendants in *Jeffers* violated Section 2 is that black citizens "have less opportunity than other members of the electorate to elect representatives of their choice." There is no *finding* that black voters have "less opportunity than other members of the electorate to participate in the political process." And when it comes to a discussion of the Section 2 claim, the majority in *Jeffers* states:

At the outset, defendants make two legal arguments that would bar the action altogether if successful. First, they say that under the plain language of Section 2(b) plaintiffs must show two separate things: (1) that they have less opportunity to participate in the political process; and (2) that they have less opportunity to elect representatives of their choice. Even if they have shown the second, the argument, runs, they cannot win this case, because they cannot make the first showing. There are no presently existing legal barriers to voting by black citizens in Arkansas, and therefore they have just as much opportunity to participate in the political process as anyone else.

730 F.Supp. at 204. So, even though the majority in *Jeffers* went on to say that the defendants' argument did not reckon with the present effects of past discrimination, it acknowledged that in Arkansas black voters had as much opportunity in the 1981–1990 period to participate in the political process as anyone else. It is for that reason that it recognized that if plaintiffs had to prove as an essential element of their Section 2 claim that because of the district lines they had less opportunity to participate in the political process than others, then their action under Section 2 would fail.

*Turner,* at 576–577.

This point is made in a slightly different way in Cunningham and Beard's recent monograph entitled "The Re-Segregation of America: The Racial Politics of Legislative Redistricting," University of Massachusetts, August, 1993, p. 19 where it is said:

The point has also been made that the drawing of political district boundaries is quite likely neither the cause nor the cure of socioeconomic ills. While a footnote in the Senate Report on the Voting Rights Act has been seized upon to make the argument that it is the reinforcement of the discrimination by the district lines that causes a harm which must be remedied, it is clear that the effects of discrimination in education, employment and health are not the evils which the Voting Rights Act aims to eliminate. The correct targets are the flaws in the districting plan which deny the minority citizenry the equal opportunity to participate and elect candidates of their choice—nothing more, nothing less.

Further doubt is cast on the *Jeffers I* majority opinion by the case of *Armour v. Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991) decided by a three-judge district court on September 4, 1991. The issue is: what does "representatives of their choice" mean as found in § 2? The majority in *Jeffers I* state that black voters:

"... can elect a candidate of their choice, in a district in which the voting age population is majority white, only if that candidate is white."

The Court in effect acknowledged that blacks regularly were successful in electing white candidates of their choice. Since it ruled that the defendants have violated § 2 of the Voting Rights Act, the majority necessarily interpret "representatives of their choice" to mean black candidates of their choice.

But note the following language from *Armour*:

> The next question that we address is whether black voters could elect a candidate of their choice in a redrawn district. For the reasons set forth below, we find that plaintiffs have shown that in the proposed district they will be able to elect a candidate of their choosing. Defendants go to great lengths to demonstrate that based upon racial voting patterns plaintiffs will not be able to elect a black candidate without a majority of black voters in the redrawn district. However, defendants misapprehend the requirements of the Voting Rights Act. The issue is not whether the plaintiffs can elect a black candidate, but rather whether they can elect a *candidate of their choice.* We believe that they can.
>
> \*     \*     \*     \*     \*     \*
>
> The problem with this reasoning is that plaintiffs have demonstrated persuasively that white voters in Mahoning County do not usually vote for black candidates. Thus, there is no assurance that a black candidate winning the primary could muster sufficient white votes to be elected to office. However, our conclusion that blacks in a redrawn district could elect a candidate of their choice depends neither upon a historical correlation between the outcome of the primary and the general election nor upon speculation as to how a *black* can be elected, and therefore the inconsistency in plaintiffs' theory does not affect our conclusion.

*Armour*, 775 F.Supp. at 1059–60 (Footnote omitted) (Emphasis in original.)

As stated in "The Re–Segregation of America: The Racial Politics of Legislative Redistricting", supra, p. 20–22:

> The point here is not just that the Voting Rights Act is limited to racial, color, and language minorities. It is also that even these recognized groups, when they prove a violation of the act, are entitled only to a remedy which gives them a fair chance to elect a candidate of their choice—not a candidate of their same race or skin color or language, certainly not a candidate whose ancestors came to America from the same country.

It is clear from the pre-trial conferences in this case that plaintiffs will not be able to show they, or any other black citizens, have any less opportunity to participate in the political process in the challenged districts than other members of the electorate. It is also clear that plaintiffs will not be able to show that they have not had the opportunity to elect representatives of their choice if one assumes that "representatives of their choice" includes whites as well as blacks. This is obvious. The polling records will reveal that blacks in the affected areas overwhelming vote for the Democrat candidates in the general elections and those Democrat candidates win in the great majority of contested races. (And I believe those records will also reveal that a majority of black voters have supported the successful candidates in most Democratic Primary elections). For these reasons the present attack should be dismissed.

## *NO CHANGE IN BLACK POLITICAL OPPORTUNITY RESULTED FROM 1991 PLAN: THE "BEFORE AND AFTER" TEST.*

The next barrier to this challenge to the 1991 Plan puts a different emphasis on the same point, to wit, that that Plan did not result in black voters having less opportunity than others to participate in the political process and to elect representatives of their choice. But here we emphasize the "before and after" test.

Section 2 of the Voting Rights Act clearly assumes a bench mark and that bench mark is the condition existing immediately prior to the adoption of the challenged Plan. So, unless Section 2 is an affirmative action statute[7], plaintiffs' claim will have to be dis-

---

7. My views on this question are expressed in part in my dissent in *Jeffers v. Clinton*, 756 F.Supp. 1195 (E.D.Ark.1990) at 1209 as follows:

> What principle is more important in our national life than the principle of political equali-

ty? If there is any area where race-based, or language-based, preferences—affirmative action, if you will—have no place, it is, I suggest, in the political arena. Congress did not intend to create such preferences. And, if it should

missed. This issue was discussed in both the *Jeffers I* and in the *Turner* cases.

The dissent in the first *Jeffers I* decision pointed out:

> The Section 2 law in this "gerrymandering" (districting or redistricting) area developed as a negative proscription. The law prohibits "fragmenting" or "packing" cohesive political groups of black citizens with the effect of diluting their voting power. The law did not develop in the context of affirmative obligations to reach out and include larger numbers of black citizens *in order to enhance black political power*. In other words, the mandate was "you shall not harm" rather than "you shall help." When dealing with the negative proscription, the issues were simple and straightforward. If blacks possessing majority political power in a single district were divided into two districts, in each of which they constituted a minority, everything was quite simple and straightforward. Or, if one, say, took two 60% black VAP districts and divided the black VAP so that one district had 80% and the other 40%, the case would also be clear. And the multi-

member-at-large district is likewise a relatively simple case.

But here, plaintiffs made no direct effort to show that district lines were drawn in 1981 in a way which had the effect of packing or breaking up or fragmenting *prior existing politically cohesive black groups*. I waited in vain for evidence comparing the political status of blacks in the districts created in 1971 with their political status in the districts created in 1981. I asked myself: did the new lines drawn in 1981 decrease, limit, curtail or lessen, the effectiveness of black political participation by fragmenting or packing or otherwise? But plaintiffs eschewed this approach in favor of a theory that they need only show that the defendant Board in 1981 failed to take the opportunity to enhance black political effectiveness. The plaintiffs' view apparently is that it is immaterial whether they were better off politically under the 1981 plan than under the 1971 plan. Their point is that they were not better off under the 1981 plan than they *could have been if* the Board had taken advantage of every opportunity to enhance their political posi-

choose to pass legislation creating such preferences, that legislation would, in my opinion, be unconstitutional. Justice Blackmun's "elegant phrase" should not be seized upon or distorted in an attempt to justify court-ordered political discrimination. Whatever latitude may be constitutionally granted to voluntary affirmative action programs in other areas, our political life should be free from discriminatory preferences.

We do not "get beyond racism" in the political sphere by creating conditions which tend to perpetuate racial separateness. If unintentional violations of Section 2 require the creating of majority VAP black legislative districts, then any increment beyond simple majority status must, in my opinion, be justified (See discussion above). This "equilibrium remedy" would have the additional merit of necessitating, or at least not foreclosing, coalition building, which, in turn, would reduce the significance of racial politics over time. But when black VAP figures of over 60% are required—as the majority has done here—there will be no need, and therefore no incentive, for the black majority to reach out to their white fellow citizens, that is, to "get beyond racism."

One expects the response, "So what is new? Whites have held such majority status over blacks for years and still do almost everywhere in this nation. Why is that situation all right and this all wrong?"

The answer is simple. Until racial polarization occurs, race is not central in the political processes of America. Neither is religion or language. We may be Democrats, Republicans, members of "Third Parties," or Independents. Rational political controversy is shaped by ideas, issues, self-interest, and the perceived merits of the candidates. Black makes no more difference than German or Irish; white than Asian; Christian than Jew or atheist. Yes, our backgrounds (including our racial identities), economic circumstances, political philosophies, and even religious beliefs may affect our politics but, overall, the emphasis is on rational politics. The influence of minority viewpoints in such a mix can be dramatic. And the racial politics that remain—and I recognize that our nation, despite much progress, is not yet beyond the evil and sickness of racism—tend to be submerged over time by the more compelling interest that characterize rational political dispute. Most important, it is not the law that is creating or supporting the racial politics that continues to exist. The law should help us get beyond race. The Congress has done its part by mandating equal opportunity in the political arena. It is wrong for the courts to go beyond Congress' mandate by forcefully creating conditions that reward racial polarization and encourage its perpetuation.

tion. This is clearly an affirmative action theory. Affirmative action by definition carries implications of intent which may relate to plaintiffs' constitutional claims but have only tangential relevance to their Section 2 "results" claims.

In *Turner, supra,* which was an attack on congressional redistricting, the Court analyzed the issue as follows:

But there is another more fundamental issue confronting the Court in this case and in *Armour.* In *Armour,* as here, the redistricting act under attack did not change in any significant way the population alignments that existed immediately prior to its implementation. So the fundamental issue arises: Is Section 2 an affirmative action statute at the liability stage?

How do the black plaintiffs and the black Walker intervenors contend that Act 1220 results in black voters having less opportunity to participate or to elect? "Less" assumes some benchmark. Less than what?

The plaintiffs' Complaint states that "the *1980* redistricting plan and the proposed [Act 1220] plan fractured black population between the First, Second and Fourth Congressional Districts."

\* \* \* \* \* \*

But the uncontested facts show that Act 1220 did not "fracture the black population into three different congressional districts." Rather it left those populations essentially undisturbed. Indeed, in their Brief, plaintiffs lament that the motivation of Act 1220 was "the preservation of the status quo." Plaintiffs' Brief, p. 17.

In their oral presentation during the first in-court conference in this case, plaintiffs suggested that the problem of fracturing the black vote goes back to the 1960's and maybe earlier. This is a recognition that in recent decades there have been no major changes in the black populations occasioned by the congressional redistricting process. Critical here, there was no significant change in 1991 from the plan adopted and approved by the Court in 1982.

So unless the legislature was obligated on the occasion of each redistricting to seek out ways and means to increase or enhance the influence of black voters, plaintiffs and the Walker intervenors must lose.

Some will say that the United States Supreme Court's actions in disposing of the *Jeffers* appeal constitute an approval *sub silentio* of the view that Section 2 is, indeed, an affirmative action statute requiring the states during any redistricting process to maximize the political effectiveness of black voters. But this can only be "judicial legislation," for Section 2 only prohibits the imposition or application of any standard, practice or procedure in a manner that results in black voters having less opportunity than others to participate in the political process or to elect representatives of their choice. "Less opportunity" by any fair interpretation means "less opportunity" than such black voters had immediately before the imposition or application of the challenged standard practice or procedure; not "less opportunity" than they would have, had the legislature seized the opportunity to help them by maximizing their political influence.

It is the Court's opinion that Section 2, in the context of this case, is not an affirmative action statute. It seeks equal opportunity—not unequal opportunity. And even though affirmative action type *remedies* may be available (within constitutional limits) upon proof of a violation of the statute, that statute is not violated by a state legislature simply because that legislature does not enact a districting plan that maximizes black political power or influence. The legislature's plan, to trigger Section 2 relief, must first harm or dilute black political opportunity. If it does not, there is no violation and no predicate for potential draconian enhancement remedies such as we find in *Jeffers.* So on this basis alone, plaintiffs and the Walker intervenors must lose on their Section 2 claim.

Justice Scalia in his dissent in *Chisom* recites established principles of statutory construction that so often are overlooked or ignored in dealing with the Voting Rights Act:

Section 2 of the Voting Rights Act is not some all-purpose weapon for well-inten-

tioned judges to wield as they please in the battle against discrimination. It is a statute. I thought we had adopted a regular method ·for interpreting· the meaning of language in a statute: first, find the ordinary meaning of the language in its textual context; and second, using established canons of construction, ask whether there is any clear indication that some permissible meaning other than the ordinary one applies. If not— and especially if a good reason for the ordinary meaning appears plain—we apply that ordinary meaning.

*Chisom* [501 U.S. at ——], 111 S.Ct. at 2369 (Scalia, J., dissenting). He laments the approach that "begins not with· what the statute says but with an expectation about what the statute must mean."

As method, this is just backwards; and however much we may be attracted by the result it produces in a particular case, we should in every case resist it. Our job begins with a text that Congress has passed and the President has signed. We are to read the words of that text as any ordinary Member of Congress would have read them, see *Holmes, The Theory of Legal Interpretation,* 12 Harv. L.Rev. 417 (1899), and apply the meaning so determined.

*Id.* It is the failure to follow such wise counsel that has resulted in most of the confusion we find in the Section 2 cases.

And the *Turner* opinion later observes:

Congress did not intend to provide minority voters with the "maximum feasible minority voting strength." *Gingles,* 478 U.S. at 94, 106 S.Ct. at 2789 (O'Connor, J., concurring). The maximum minority voting strength would be tantamount to proportional representation, which is expressly prohibited by the language of the statute. Plaintiffs' argument to the contrary is inconsistent with the *"results"* test enacted in the statute and the clear disclaimer of any right to proportional representation. *Id.* Indeed, the Supreme Court has rejected any claim to proportional representation or "maximum feasible representation" throughout the history of the Voting Rights Act. *See, e.g., White v. Reges-*

*ter,* 412 U.S. at 765–66, 93. S.Ct. at 2339–40 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 148–56, 91 S.Ct. 1858, 1871–76, 29 L.Ed.2d 363 (1971).

If my understanding is correct that the 1991 Plan made only those minor changes from this Court's 1990 approved plan necessitated by population changes, and that the opportunity for black citizens "to participate" and "to elect" was essentially the same immediately before and after the implementation of the 1991 Plan, then plaintiffs' Section 2 challenge must fail.

## PACKING BY CREATION OF SUPER-MAJORITY BLACK DISTRICTS

Now we return to the issue presented more directly by plaintiffs' attack here: packing. The 1991 Plan for the Delta Region establishes four House Districts and one Senate. district with black-majority voting age populations ("VAP"). These districts have black VAPs of at least 60%. Plaintiffs claim that the results in concentrating or packing black voters into too few districts thus minimizing the total number of districts in which black voters can elect representatives of their choice.

How did such "super-majority" black districts come into being?

*Smith v. Clinton,* 687 F.Supp. 1310 (E.D.Ark.1988); 687 F.Supp. 1361 (E.D.Ark. 1988) was an attack by black voters on an at-large dual member state representative district located in Crittenden County, Arkansas. The Court held that such district denied such voters an equal opportunity to participate in the political process. At the remedy stage the court, in an opinion authored by Judge Richard Arnold, stated:

Defendants also argue that plaintiffs' evidence fails to justify what they call a "supermajority" black district.

\*  \*  \*  \*  \*  \*

It is widely understood that "minorities must have something more than a mere majority even of voting age population in order to have reasonable opportunity to elect a representative of their choice." *Ketchum v. Byrne,* 740 F.2d 1398, 1413 (7th Cir.1984), *cert. denied,* 471 U.S. 1135,

105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). Moreover, the extent to which minorities must outnumber whites in the relevant jurisdiction is a matter of "general acceptance in redistricting jurisprudence." *Id.* at 1415–16 (citing cases).

A guideline of 65% of total population is frequently used, and is derived by supplementing a simple majority with an additional 5% to offset the fact that minority population tends to be younger than that of whites, 5% for the well-documented pattern of low voter registration, and 5% for low voter turnout among minorities. When voting-age population figures are used, a 60% nonwhite majority is appropriate. *Id.*

This rationale was used in the approval by the *Jeffers I* majority of black super-majority districts as part of the remedy for the violations of Section 2 found to have been caused by the 1981 Plan. Note their language:

Plaintiffs take exception to HD 74 and HD 75 as proposed. HD 74 as proposed has a BVAP of 58%, includes parts of Lee and St. Francis Counties, and has a resident incumbent white State Representative. HD 75 as proposed has a BVAP of 56% includes parts of Monroe and Phillips Counties, and also has a resident incumbent white State Representative. Plaintiffs say these percentages are too small to give black voters a realistic chance to elect representatives of their choice. They propose modifications under which HD 74 will have a 63% BVAP, and HD 75 a 64% BVAP.

\*    \*    \*    \*    \*    \*

Defendants point out that they are the authorities charged by law with drawing the lines. Their action represents official State policy. It should be treated with some deference. If the districts they propose would have been upheld at the liability stage of the case, they must be upheld now. See *McGhee v. Granville County,* 860 F.2d 110, 115 (4th Cir.1988). At least in the present context, we agree with all of that. *But the point is precisely that the Board's HDs 74 and 75 would have been*

*held unlawful at the liability stage of this case, simply because they are (1) below 60% BVAP and (2) easily expanded without sacrificing principles of compactness and contiguity.* (Emphasis supplied.)

So in 1990 this Court mandated and justified certain black supermajority districts outside of Pulaski County. *This was in response to the plaintiffs' request.* This Court ordered plan was what the members of the new Board of Adjustment had to deal with in 1991 when they had to make district boundary changes to conform with the 1990 census figures.

While it should be open to *other* black (or white) citizens to object to these black supermajority districts, it is my opinion that *these Jeffers plaintiffs* (being the same in *Jeffers II* as they were in *Jeffers I*) should be estopped from arguing or contending that the black super-majority districts (outside of Pulaski County) created by the 1991 Plan violate Section 2.

It was, and is, my view that, if the creation of majority black districts as a court ordered remedy is permitted, then the black voting age population in those districts should not, as a rule, exceed a simple majority. That was my opinion at the remedy stage in *Jeffers I.*[8] At the same time I do not believe that the *Jeffers* plaintiffs who were responsible for the creation of such super-majority districts, should be permitted to complain that the defendant members of the Board of Apportionment attempted to follow *this Court's* 1990 judgment in formulating its 1991 Plan. This conclusion would foreclose all of the current attacks except those affecting Pulaski County.

*PULASKI COUNTY.*

In its 1989 decision the majority in *Jeffers I* treated the Delta, the Jefferson County area, and the Ouachita–Nevada Counties area as a group and found that the 1981 Plan relating to those areas violated Section 2. But it came to a different conclusion with regard to Pulaski County, I quote the majority's analysis:

What about Pulaski County? Is it materially different from the areas we have just

---

**8.** See dissent in *Jeffers v. Clinton,* 756 F.Supp. 1195, 1204–1215 (E.D.Ark.1990).

discussed? Many of the same factors are present.

\*   \*   \*   \*   \*   \*

Furthermore, the extent of socio-economic depression among black people is less pronounced in Pulaski County. As the table appearing at p. 211 above shows, among the 16 counties affected by the case, Pulaski County has the highest percentage of black high-school graduates, the highest black per capita income, the smallest proportion of black families below the poverty level, the smallest percentage of black people without a telephone, and the second smallest percentage of black people without a car. More importantly, the whole political atmosphere, with respect to black opportunity and participation, seems more open Carol Willis, a man of wide political and governmental experience to whom we referred earlier summed it up: Pulaski County is different.

Is it different enough? The question, in the end, is one of judgment, as to which reasonable politicians and judges may differ.

\*   \*   \*   \*   \*   \*

We think a factor not yet mentioned tips the balance against plaintiffs' claim in Pulaski county: the preference of the black community in Pulaski County, as expressed by two of its elected representatives, for the status quo. State Representatives Irma Hunter Brown and Grover Richardson, who in 1981 were two of the three black members serving in House district 62–64, both told the State Board of Apportionment that they preferred the existing multi-member arrangement to a system of 15 single-member districts in Pulaski County.

\*   \*   \*   \*   \*   \*

After a careful consideration of all the factors, we resolve this close question in favor of the defendants. It would be unfair to fault the Board of Apportionment for acceding to the expressed wishes of the only two black legislators from Pulaski County who appeared before it.

In sum, we hold that no violation of Section 2 of the Voting Rights Act has been shown in Pulaski County.

So, if and when this case is tried, how will the Court treat its own findings in *Jeffers I*, and how will it treat the pertinent findings of other judges in other cases?

In *Smith v. Clinton*, 687 F.Supp. 1310 (E.D.Ark.1988) the Court stated at p. 1317:

The Court takes judicial notice that there is a history of racial discrimination in the electoral process in Arkansas. See *Perkins v. City of West Helena*, 675 F.2d 201, 211 (8th Cir.) *aff'd mem.*, 459 U.S. 801, 103 S.Ct. 33 74 L.Ed. 2d 47 (1982). We do not believe that this history of discrimination, which affects the exercise of the right to vote in all elections under state law, must be proved anew in each case under the Voting Rights Act.

As recently as June 21, 1993, Judge Susan Wright filed a Memorandum Opinion and Order in *LRSD v. Pulaski County Special School District, et al*, LR–C–82–866 which dealt with Section 2 Voting Rights challenges to the zones used to elect members of both the LRSD Board and the Pulaski county District Board. The only other school district within Pulaski County is the North Little Rock District. Pertinent excerpts from Judge Wright's findings and conclusions are attached hereto as Appendix A. And among the findings made in *Leadership Roundtable v. City of Little Rock*, 499 F.Supp. 579 (E.D.Ark.1980) I note the following:

Under the general standard of *Whitcomb v. Chavis, supra*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, which was rearticulated in *White v. Regester, supra*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, the plaintiffs are not entitled to relief, since they have not demonstrated that they have less opportunity than other citizens or groups of citizens to participate in the political processes of Little Rock and to elect city directors of their choice. Rather, the Court concludes, on the basis of all the evidence, that they have the same opportunity as other citizens of Little Rock to participate in the political processes and to elect directors of their choice.

\*   \*   \*   \*   \*   \*

Although a majority of the Supreme Court rejected the Fifth Circuit's *Zimmer* analysis as conclusive in *Mobile v. Bolden,* 446 U.S. [55] at 69–74, 100 S.Ct. [1490] at 1501–1503, 1511 [64 L.Ed.2d 47], the plurality acknowledged that the presence of the indicia relied upon in *Zimmer* may be some evidence of unconstitutional discrimination. *Id.* at 74, 100 S.Ct. at 1503. Even under the *Zimmer* analysis, which is not itself sufficient to prove unconstitutional discrimination, the plaintiffs have not made the required showing of indicia of discrimination.

(1) Blacks have complete accessibility to Little Rock's political processes and to candidacy for city director positions.

\*  \*  \*  \*  \*  \*

(4) Past discrimination does not have a significant adverse effect upon blacks' participation in the election system in Little Rock.

If and when the case goes to trial, I suggest that the above findings should be considered and given appropriate weight in so far as they relate to any of the geographical areas placed in issue here. More narrowly, I suggest that the evidence at this trial should be limited to that which was *not* available to the plaintiffs when *Jeffers I* was tried in 1989–1990.

*THE SUMMARY JUDGMENT MOTION*

I would have delayed passing on the defendants' motion for summary judgment until the plaintiffs had tendered detailed maps of their proposed districts accompanied by a complete and detailed narrative description of each, and also detailed maps and descriptions of the challenged districts created by the 1991 Plan adopted by the defendants. Without that information we can not fairly deal with the defendants' contention that the black population is not sufficiently compact or contiguous to meet this precondition of *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986). And, yet, with such information, it might appear that this requirement had not been met and that, therefore, no trial would be needed.

With the recent decision of the United States Supreme court in *Shaw v. Reno,* ——

U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), the exact shape and location of district boundaries become even more important than such circumstances were under *Gingles.*

Before proceeding to trial I would also have insisted on plaintiffs summarizing the evidence (which became available *after* the *Jeffers I* trial) upon which they will rely in their attempt to prove Section 2 violations resulting from the 1991 Plan. We could then readily determine if genuine material factual issues remained to be tried. By not pursuing these inquiries pre-trial we risk committing substantial judicial and litigant resources to a trial which may have no effect on the outcome of the case.

I concur with the majority that no settlement agreement precludes plaintiffs' challenges to the 1991 Arkansas Apportionment Plan.

*CONCLUSION*

As I have attempted to explain in *Jeffers I,* in *Turner,* and herein, there was no basis for the majority's conclusion in *Jeffers I* that the then defendants violated Section 2 in implementing the 1981 Plan. Any possible arguments to the contrary have been undercut by the later decisions in *Chisom* and *Armour.*

And even though I see fatal flaws in this current attack on the 1991 Plan, see discussion above, the majority views it otherwise. Since we are, therefore, heading into a trial I suggest the parties keep in mind the following language from Justice O'Connor's opinion in *Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993):

Classifications of citizens solely on the basis of race "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943). Accord, *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility. *[Richmond v. J.A.] Croson, supra,* 488 U.S. [469], at 493, 109 S.Ct. [706] at 721 [102 L.Ed.2d 854] (plurality opinion); *UJO*

[v. Carey], supra, 430 U.S. [144], at 173, 97 S.Ct. [996], at 1014 [51 L.Ed.2d 229] (Brennan, J., concurring in part) ("[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race-consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs"). Accordingly, we have held that the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest. *Id.* ── U.S. at ──, 113 S.Ct. at 2824–2825. Put differently, we believe that reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes.

\*　　\*　　\*　　\*　　\*　　\*

By perpetuating such notions, a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority minority districting is sometimes said to counteract.

The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy. As Justice Douglas explained in his dissent in *Wright v. Rocke-*

*feller* [376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512] nearly 30 years ago:

"Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by Negro, as it is with the notion that district B must be represented by a Caucasian, District C by a Jew, district D by a Catholic, and so on ... That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense ...

"When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist antagonisms that relate to race or to religion rather than to political issues.... communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here." 376 U.S., at 66–67 [84 S.Ct. at 611] (dissenting opinion) (internal citations omitted).

For these reasons, we conclude that a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification. It is unnecessary for us to decide whether or how a reapportionment plan that, on its face, can be explained in nonracial terms successfully could be challenged. Thus, we express no view as to whether "the intentional creation of majority-minority districts, without more" always gives rise to an equal protection claim. *Post,* at 2839 (WHITE, J., dissenting). We hold only that, on the facts of this case, plaintiffs, have stated a claim sufficient to defeat the state appellees' motion to dismiss. *Id.* ── U.S. at ──, 113 S.Ct. at 2827–2828. Racial classifications of any sort pose the risk of lasting harm to our society. They

reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin. Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.

*Id.* at ——, 113 S.Ct. at 2832.

I will probably have more to say about the *Shaw* case during and after the trial.

A final observation taken from the "Occasional paper" written by Messrs. Cunningham and Beard:

No one can deny the baleful effects racism has had in denying African–Americans and other citizens their rightful influence in American politics, or the necessity for remedial action when minority votes are devalued by government action. But the notions advanced by Professor Guinier and others, of a proportional number of guaranteed seats for "authentic" representatives of racial interest groups, simply fall outside the best traditions of American democracy. Separate but equal won't do. We can honor our differences, without requiring a balkanized confederacy. As former Congresswoman Barbara Jordan of Texas stated at the 1992 Democratic National convention, "We are one, we Americans. We are one. And we reject any intruder who seeks to divide us on the basis of race and color. We honor cultural identity ... But separatism is not allowed. Separatism is not the American way ... Our strength in this country is rooted in our diversity. Our history bears witness to that fact. *E Pluribus Unum*—from many, one. It was a good idea when the country was founded, and it's a good idea today. From many, one. That still identifies us."

"The Re–Segregation of America: The Racial Politics of Legislative Redistricting," Supra, p. 22–23.

This case should be dismissed for lack of jurisdiction and for the other reasons set forth above.

## APPENDIX A

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF ARKANSAS

## WESTERN DIVISION

LITTLE ROCK SCHOOL DISTRICT, PLAINTIFF,

v.

PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, ET AL., DEFENDANTS

MRS. LORENE JOSHUA, ET AL., INTERVENORS,

KATHERINE W. KNIGHT, ET AL., INTERVENORS.
NO. LR–C–82–866

*MEMORANDUM OPINION AND ORDER*

\*　\*　\*　\*　\*　\*

FINDINGS OF FACT

\*　\*　\*　\*　\*　\*

19. There are no significant barriers to participation in the political process in the LRSD.... There was no testimony that there exist any legal barriers to participation in the political process by black candidates.

20. No evidence was presented to show that black citizens have less opportunity to participate in the political process under the plan adopted by the PCBE than they do under the present plan....

21. Black citizens do not have less opportunity to elect representatives of their choice under the plan adopted by the PCBE than they do under the present plan....

22. In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court referred to factors listed in the Senate Judiciary Committee report accompanying the 1982 amendments to § 2 of

the Voting Rights Act as being relevant to a § 2 claim. The Court makes the following findings in accordance with those· factors:

A. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

While the Charles plaintiffs presented no evidence of a history of official discrimination, the Court will take judicial notice that there has been a history of official discrimination in voting. · *Jeffers v. Clinton,* 730 F.Supp. 196, 210 (E.D.Ark.1989). The Charles plaintiffs presented no evidence, other than demographic information which shows socio-economic · differences between blacks and whites, that the history of official discrimination in Arkansas has resulted in black citizens having less opportunity to participate in the political process and to elect representatives of their choice under the plan proposed by the PCBE. This demographic evidence does not prove or disprove that the district lines drawn in 1986 or 1992 resulted in blacks having less opportunity to participate in the political process and to elect representatives of their choice. The history of official discrimination is remote in time to the preparation of the PCBE plan and will therefore be given little weight.

B. The extent to which voting in the elections of the state or political subdivision is racially polarized.

The evidence presented by the Charles plaintiffs tends to indicate that black voters constitute a politically cohesive unit. . . .

The Charles plaintiffs failed to prove that white bloc voting normally will defeat the combined strength of minority support plus any white cross-over vote for black candidates. The evidence was insufficient to show that white voters tend to group together to defeat black candidates. The evidence indicates that black candidates have achieved considerable success against white candidates.

Charles Exhibits 32 and 33 show ten elections (nine at large; one zone) since 1986 in which black candidates opposed white candidates. In six of those elections, the black candidate was successful. Only two of the elections involved the LRSD. In both the at-large 1986 LRSD race and the LRSD Zone 2 1989 race, the black candidate defeated. the white candidate. In the 1988 race for 'a municipal judgeship in the City of· Little Rock, the black candidate was successful. The black candidates were also successful in three of the seven at-large elections for a position on the Little Rock City Board of Directors.

Charles Exhibit ·35 shows the results of twenty-five elections between 1962 and 1992 in which black candidates sought positions on the Little Rock City Board of Directors. The black candidates were successful in ten of those elections.

The Court finds that there does not exist in Little Rock a sufficient white bloc vote to usually defeat the candidate preferred by minority voters. Although there was some evidence that a significant number of minority group members usually vote for the same candidate, the Court finds that legally significant racially polarized voting does not exist in the City of Little Rock or the LRSD.

C. The extent to which the state or political subdivision has used· unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

There is no evidence that the LRSD has adopted any practice or procedure that may enhance the opportunity for discrimination against the minority group. The State of Arkansas has adopted a majority vote requirement which applies to school district elections. Ark.Code Ann. § 6–14–121 (Michie 1991). There is no evidence that the majority vote requirement has had any· impact on the success or failure of any .black candidate in a school district election.

*       *     .  *       *       *       *

G. The extent to which members of the minority group have been elected to public office in the jurisdiction.

The Charles plaintiffs presented evidence of only two LRSD elections. Black candidates won them both. They presented evidence on one election for the position of municipal judge, and that race was won by a black. As noted above under subparagraph B, the plaintiffs presented evidence of twenty-five elections for the position of Little Rock City Board of Directors from 1962 to 1992 in which black candidates participated. Black candidates won ten of the twenty-five races in which one or more blacks participated. Charles Exhibit 35. LRSD Exhibit 2 shows that in 1983 two black candidates ran at-large races for positions on the LRSD Board of Directors, each opposing a white candidate. Black candidates Bill Hamilton and Katherine Mitchell received 70% and 34% of the vote, respectively. According to LRSD Exhibit 5, Mr. Hamilton received 82% of the vote against white candidate Frederick Lee in the 1989 LRSD Zone 2 election. LRSD Exhibit 4 shows that white candidate Charles Young defeated black candidate Lawrence Hampton in the 1987 Zone 6 race by a slim margin, 250 to 218 votes. Zone 6 was then a 72% white zone.

The percentage of black representation for at least the last ten years on both the LRSD Board of Directors and the City of Little Rock Board of Directors has been 28.5% compared with a city-wide black population of 34% and a black voting age population of 28%.

\*   \*   \*   \*   \*   \*

## CONCLUSIONS OF LAW

\*   \*   \*   \*   \*   \*

2. This Court may not substitute its judgment for that of the PCBE. The Supreme Court has held it is error for a federal district court not to defer to state efforts to redraw legislative districts. *Voinovich v. Quilter*, 507 U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500, 513 (1993). *See also Turner v. State of Arkansas*, 784 F.Supp. 553, 573 (E.D.Ark.1991), *aff'd* —— U.S. ——, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992). Therefore, this Court may not alter or amend the districting plan adopted by the PCBE absent finding a violation of federal law.

3. In order to prevail on their claim that the new districting plan violates § 2 of the Voting Rights Act, the plaintiffs must prove that they will have less opportunity under the plan adopted by the PCBE to participate in the political process and less opportunity to elect representatives of their choice than under the plan approved by Judge Woods in December of 1986. *Chisom v. Roemer*, 501 U.S. ——, ——, 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348, 364 (1991); *Turner*, 784 F.Supp. at 589.

\*   \*   \*   \*   \*   \*

4. The PCBE is not required by the Voting Rights Act to create the maximum number of majority black districts. The Act is not an affirmative action statute, and it "is not violated by a state legislature simply because that legislature does not enact a districting plan that maximizes black political power and influence." *Turner*, 784 F.Supp. at 573. The *Turner* court explained:

Congress did not intend to provide minority voters with the "maximum feasible minority voting strength." *Gingles*, 478 U.S. at 94, 106 S.Ct. at 2789 (O'Connor, J., concurring). The maximum minority voting strength would be tantamount to proportional representation, which is expressly prohibited by the language of the statute.

*Turner*, 784 F.Supp. at 577. The mandate of the Voting Rights Act is "you shall not harm" rather than "you shall help." *Jeffers*, 730 F.Supp. at 241 (Eisele, J., concurring and dissenting). Thus, the Voting Rights Act does not require the PCBE to create another majority black district.

\*   \*   \*   \*   \*   \*

7. It is clear that in order to prevail on their § 2 claim, plaintiffs must prove both less opportunity to participate in the political process and less opportunity to elect representatives of their choice. In *Chisom*, the Supreme Court stated:

[T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political

process. The statute does not create two separate and distinct rights.

\* \* \* \* \* \*

It would distort the plain meaning of the sentence to substitute the word "or" for the word "and." Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect.

*Chisom,* 501 U.S. at ——, 111 S.Ct. at 2365, 115 L.Ed.2d at 364. *See Turner,* 784 F.Supp. at 574 n. 20. The *Turner* court provided guidance for determining whether a plaintiff will have "less opportunity" to participate:

> "Less opportunity" by any fair interpretation means "less opportunity" than such black voters had immediately before the imposition or application of the challenged procedure; not "less opportunity" than they would have, had the legislature seized the opportunity to help them by maximizing their political influence.

*Turner,* 784 F.Supp. at 573.

\* \* \* \* \* \*

9. Consideration of the Senate factors in determining whether a violation of § 2 exists has been criticized because the factors often take attention away from the real issue. In this regard, the court in *Whitfield v. Democratic Party of Arkansas,* 686 F.Supp. 1365 (E.D.Ark.1988), *aff'd* 902 F.2d 15 (8th Cir. 1990) wrote:

> Having reviewed the Senate Report factors and some of the proof relating thereto, the Court must determine whether its positive findings with respect to many of those factors make it more probably true than not true that the challenged runoff provision makes the political processes not "equally open to participation" by blacks in that blacks have "less opportunity than whites to participate in the political process and to elect representatives of their choice."
>
> It should be apparent by now that most of the positive findings with respect to the Senate Report factors have no tendency to prove, or disprove, that proposition. The

truth is that focusing on some of those factors serves more as a distraction than a useful tool for evaluating the cause and effect operation of the challenged runoff laws.

*Id.* at 1386–87. *See also, Jeffers,* 730 F.Supp. at 232 (federal courts have felt the need to make findings concerning the Senate factors whether or not they have any relevance to the issues at hand). An evaluation of the Senate factors adds little to the inquiry here of whether, under the new districting scheme adopted by the PCBE for the LRSD Board of Directors, the Charles plaintiffs have "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973(b). Each Senate factor is discussed above in the Court's findings of fact. Further discussion of each factor is not necessary. The Senate factors will be discussed below only where they are relevant to the issue being analyzed.

10. The first question in analyzing the Charles plaintiffs' § 2 claim is whether the challenged plan results in them having "less opportunity than other members of the electorate to participate in the political process ..." 42 U.S.C. § 1973(b). Here, the Charles plaintiffs must prove that the districting scheme adopted by the PCBE results in their having less opportunity to participate in the political process than under the 1986 plan.

In this regard, the Charles plaintiffs presented proof with respect to the Senate factor concerning the residual effects of past discrimination. As the court stated in *Whitfield,* "[b]ecause there are no legal barriers remaining to the opportunity of blacks to participate in the electoral process, plaintiffs have naturally emphasized the 'socioeconomic' factors." 686 F.Supp. at 1384. *See also Turner,* 784 F.Supp. at 577 "There are no presently existing legal barriers to voting by black citizens in Arkansas, and therefore they have just as much opportunity to participate in the political process as anyone else." (quoting *Jeffers,* 730 F.Supp. at 204); *Leadership Roundtable v. City of Little Rock,* 499 F.Supp. 579, 584 (E.D.Ark.1980) ("Since

1965, there has been no legal impediment in Arkansas to voting by blacks.").

In *Jeffers,* 730 F.Supp. 196, a case challenging the state apportionment plan, the court found no voting rights violation in Pulaski County. The court found that while the county shares many of the same characteristics of other areas of the state, racial polarization in voting and the extent of socio-economic depression among black people are less pronounced in Pulaski County. "More importantly, the whole political atmosphere, with respect to black opportunity and participation, seems more open." *Id.* at 216.

The Charles plaintiffs rely entirely on Mr. Lynch's compilation of census data indicating that blacks are poorer, less educated, have fewer vehicles, and have a higher percentage of households headed by single females than the general population. Mr. Lynch concludes that these socio-economic factors decrease the ability of blacks to participate in the political process. Consideration of these factors, however, provides no insight into whether the districting scheme adopted by the PCBE provides the Charles plaintiffs with less opportunity to participate in the political process than under the previous plan. Regardless of where the lines are drawn, the Charles plaintiffs will have the same socio-economic status. "[I]t is not the line drawing by the [PCBE] which 'results' in blacks having less such opportunity; rather, it is the diminished socio-economic status found to have resulted from prior discrimination. And Section 2 does not purport to give a remedy solely on the latter basis." *Jeffers,* 730 F.Supp. at 237.

Therefore, the Charles plaintiffs have not proved that they have less opportunity to participate in the political process under the districting plan adopted by the PCBE.

\* \* \* \* \* \*

16. The Charles plaintiffs have not proved either element of a Voting Rights Act claim. The PCBE plan does not result in less opportunity to participate in the political process based on the socioeconomic effects of past discrimination because these socioeconomic factors are present regardless of where the lines are drawn. The Charles plaintiffs did not establish the "necessary preconditions" in order to show less opportunity to elect representatives of their choice.

\* \* \* \* \* \*

SO ORDERED.